## PERKINS *v.* THE STATE.

An execution issued by the comptroller-general against a tax-collector and his sureties, for money alleged in the execution to have been collected by the tax-collector and not accounted for, can not be arrested by an affidavit of illegality.

Argued April 20, — Decided May 21, 1897.

Affidavit of illegality.  Before Judge Butt.  Taylor superior court.  April term, 1896.

*J. D. Russ, R. S. Foy* and *C. J. Thornton,* for plaintiff in ·error.

*S. P. Gilbert, solicitor-general,* and *W. E. Steed,* contra.

FISH, J.  The comptroller-general of the State issued an execution against the tax-collector of Taylor county, for a failure upon the part of said tax-collector, for the year 1892, "to make settlement of the taxes due the State and to pay into the treasury the amount of said taxes, the same being the sum of

$6,145.33." This fi. fa. was levied by the sheriff of Taylor county upon a lot of land as the property of Perkins, who was one of the sureties on the tax-collector's bond. Perkins filed an affidavit of illegality, wherein he alleged that the said tax-collector was not indebted to the State, either at the time that the fi. fa. was issued nor since that time, in any amount whatever; that at the time the fi. fa. was issued said tax-collector had paid into the treasury of the State all that he was indebted to the State for the year 1892. The case thus made was returned to the superior court of the county, and when it came on to be heard counsel for the State moved to strike the case from the docket, on the ground that there could be no judicial interference with collection of the fi. fa.; which motion, after argument, was sustained by the court. Perkins excepted to this ruling of the court, and invokes the decision of this court upon this question.

1. Section 924 of the Political Code provides that, "if any collector shall fail to settle his accounts with the comptroller-general in the terms of the law, he shall issue execution against him and his sureties for the principal amount, with interest at the rate of twenty per cent. per annum on said amount." Section 925 provides how such fi. fas. shall be directed and executed. Section 926 declares that "executions so issued shall not be suspended or delayed by any judicial interference with them, but the Governor may suspend the collection not longer than the next meeting of the General Assembly." This last section is taken from the act of 1804. It was construed by this court in the case of *Eve* v. *State of Georgia*, 21 *Ga.* 50, where it was held that "the courts are prohibited by the act of 1804 to entertain an affidavit of illegality to an execution proceeding against a defaulting tax-collector and his sureties." In that case the fi. fa. had been issued by the comptroller-general against a tax-collector and his sureties, and had been levied upon the property of certain of the sureties and they had interposed an affidavit of illegality, alleging, among other grounds, that the execution was issued for a larger amount than was due. There is no difference in the principle involved between an affidavit of illegality which alleges that there is only due

to the State a smaller amount than the execution calls for, and one which alleges that there is nothing at all due. In both instances the issue sought to be raised is simply one of fact. In the one case the practical effect of the affidavit is that the allegation of fact contained in the execution, as to the amount due by the tax-collector to the State, is untrue in part, and in the other it is that it is untrue as a whole. It is clear that, under the section of the code last cited, as construed by this court in this decision, the court below had no authority to entertain the issue proposed by the affidavit of illegality in the present case. There is, however, further authority found in the code, and in the decisions of this court, to sustain the ruling of the court below. By section 949, par. 1, of the Political Code, it is made the duty of the tax-collector "to diligently collect and promptly pay over in the funds allowed by law the State and county taxes to the comptroller-general and the county treasurer, respectively." Here two duties are devolved upon the tax-collector. The first is "to diligently collect" the "taxes"; the second is to "promptly pay over" to the proper officer "the taxes." When he is engaged in collecting from the taxpayers of the State the money due by them to the State, the money which he receives from them is "taxes"; and when he is engaged in paying over to the comptroller-general the money which he has thus collected, he is paying over to that official "taxes." Should he fail to fully settle with the comptroller-general, the State's money which remained in his hands would still be "taxes"; its character would not be changed by reason of his failure to pay it to the State. That the State's revenue which has been collected by the tax-collector and which is in his hands, and for which the comptroller-general issues an execution against him and his sureties, is "taxes due the State," will further appear by reference to section 900 of the Political Code, where it is so denominated, and also by reference to the decisions of this court in *Davis* v. *State*, 60 *Ga.* 76, and *Cahn* v. *Wright*, 66 *Ga.* 119, which so hold. The levy of the execution issued by the comptroller-general in this case then was a levy for "taxes." Under the law of this State, there can be no judicial interference with such a levy. Section 903 of the Political Code,

which is but a codification of a part of the act of 1804, is in these words: "No replevin shall lie, nor any judicial interference be had, in any levy or distress for taxes under the provisions of this code, but the party injured shall be left to his proper remedy in a court of law having jurisdiction thereof." This part of the act of 1804 was evidently intended to cover the case of a taxpayer who might seek to obstruct or to defeat a levy upon his property for taxes, and this may be its main purpose; but its language is broad enough to embrace and does include taxes due by the tax-gatherer as well as those due by the taxpayer. There is, therefore, in this section of the code another clear and positive prohibition of judicial interference in a case of this character. "The general rule," therefore, is, "that there can be no judicial interference to hinder or delay the State in the collection of taxes." *Decker* v. *McGowan,* 59 *Ga.* 805. It is undoubtedly true that there are so-called exceptions to this rule, but it is clearly evident that this case falls within none of them. These exceptions are more apparent than real, and Justice Bleckley, in discussing them in the case just above quoted from, says: "Perhaps there is not, save in instances expressly provided for by statute, a single real exception to the rule properly understood, the so-called exceptions being only apparent. Nothing is a tax but what has the nature of a tax and is imposed by some law. For an officer to exact money under the name of a tax, when there is no law to warrant the exaction, is not an attempt to collect taxes, but an attempt to collect something else; and the rule which excludes interference in the collection of taxes does not apply." Further on, in the same opinion, he says: "Upon principle, I should say that cases admitting of interference might be distinguished from those not admitting of it, by this simple test: Conceding all the elements of fact to be as the officer decides them to be, or as favorable to him as possible, would his action be legal or illegal? If legal, no interference; if illegal, interference to the extent necessary for the citizen's protection."

In the present case the comptroller-general, from the recitals in the execution issued by him against the tax-collector and

his sureties, has decided that the tax-collector is in default, in a certain amount, to the State, for the taxes collected by him for the year 1892. Plaintiff in error, upon whose property this execution has been levied, while admitting that he is one of the sureties upon the tax-collector's bond, by his affidavit of illegality takes issue with this finding of the comptroller-general, by alleging that the tax-collector had paid into the State treasury the full amount of his indebtedness to the State before the fi. fa. was issued, and owes the State nothing. It is clear, therefore, that there is no issue of law raised; the only question involved being one of fact. The surety of the tax-collector challenges the finding of the comptroller-general that the tax-collector is in default for not paying over to the State its taxes collected by him, and judicial interference is invoked for the purpose of setting aside this finding of the comptroller-general. The courts have no authority to interfere for this purpose. If the comptroller-general should err against the tax-collector and his sureties in a matter of this kind, the party or parties injured must look elsewhere than to the courts for relief. This rule seems severe; but it has been on our statute-books for nearly a century. It is strict and it is severe for the protection and the prompt collection of the public revenue, which are matters of vital necessity to the State. The tax-collector accepted, and probably sought, this office with his eyes open. He is presumed to have known the law when he accepted the public trust, and by so doing he submitted himself to the provisions of the law applicable to and governing his office, to all of their strictness and severity. The sureties on his bond impliedly contracted with the State with full knowledge of these provisions of the law, which, by implication, entered into and became a part of the contract. If they were unwilling to abide its terms, they should not have so obligated themselves.

*Judgment affirmed. All the Justices concurring.*